**SO ORDERED.**

**SIGNED this 2 day of September,2016.**

*Stephani W. Humrickhouse*

**Stephani W. Humrickhouse**
**United States Bankruptcy Judge**

_____

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## RALEIGH DIVISION

IN RE:                                                           CASE NO.

**OLLIE WILLIAM FAISON**                               **14-00073-5-SWH**

      **DEBTOR**

## ORDER DENYING CONFIRMATION AND
## REGARDING MOTION FOR RELIEF FROM STAY

The matter before the court is confirmation of the debtor's Third Amended Plan of

Reorganization ("Third Plan"), to which secured creditor SummitBridge National Investments III,

LLC ("SummitBridge") has objected. Also pending is SummitBridge's motion for relief from the

automatic stay. A hearing on confirmation, during which arguments on the objection and the motion

for relief from stay were heard, took place in Raleigh, North Carolina on May 26, 2016. For the

reasons set forth below, the court determines that the debtor has not satisfied either § 1129(a)(3) or

§ 1129(a)(11) of the Bankruptcy Code and thus confirmation of the Third Plan must be denied.[1]

The court believes, however, that a reorganization of the debtor is possible. The court will sustain

---

[1]The court does not determine the § 1129(b) issues raised by the SummitBridge objections, but notes that its comments concerning good faith and feasibility contained in this opinion apply in many respects to the fair and equitable analysis under § 1129(b).

SummitBridge's objection to plan, permit the debtor to file an amended plan, and deny SummitBridge's motion for relief from stay without prejudice.

## BACKGROUND

The debtor, O. William Faison, filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on January 3, 2014. The debtor is a trial attorney and remains in possession of the estate assets, which include sizeable real property holdings in Orange, Wake, and Vance counties. SummitBridge's claim is secured by the Orange County land, and disposition of that claim is now the main dispute before the court; the initial stages of this bankruptcy case centered on the dispute between the debtor and his ex-spouse, who had filed her own chapter 7 bankruptcy case, with respect to the real property as well as other assets. SummitBridge has three claims, which are secured by real property in Orange County and constitute a combined prepetition amount of approximately $1,627,239.82. The debtor values SummitBridge's collateral at $1,715,000. With the inclusion of interest accruing since the petition date, SummitBridge is an undersecured creditor.

On June 4, 2015, the debtor filed his first chapter 11 plan, which combined SummitBridge's three claims into a single Class 4. SummitBridge's claims 5, 6 and 7 had petition date balances of $593,091.42; $792,749.04; and $241,399.36, respectively. The claims originally were held by BB&T, then transferred to SummitBridge. Claim 6 is secured by the Patterson Lots[2] 16 and 17, and by Walker Lots[3] 1 and 2. The two Patterson Lot parcels make up what is sometimes referred to as the "upper tract," and are bisected by an area that the debtor proposes, in the plan currently before

---

[2] Patterson Lot 16 ("P-16") is 86.96 acres, and Patterson Lot 17 ("P-17") is 44.51 acres. They were appraised at $348,000 and $156,000, respectively, on July 31, 2013.

[3] Walker Lot 1 ("W-1") is 13.88 acres, and Walker Lot 2 ("W-2") is 50.21 acres. The two lots together are appraised at $320,000 as of July 31, 2013. These lots are part of the larger "lower tract."

the court (the debtor's Third Amended Plan), to designate as a wildlife common area or "Open Tract" amenity.

Claim 5 is secured by first liens on Bellechene Lots[4] 9 and 15, and on Tract A-1, which the parties sometimes refer to as the "Barn Tract." Tract A-1 consists of 142.42 acres and was appraised at $712,000 on July 31, 2013.[5] Within Tract A-1 is a roughly 10-acre parcel (per the debtor's preliminary plat) that includes a barn and riding facilities; this parcel also is sometimes referred to by the parties as the "Barn Tract," or alternatively (and more precisely) as the "Barn Lot."[6] Claim 7 is SummitBridge's second lien on the same real property that secures Claim 5.

In his first plan, the debtor proposed to develop the upper tract portion of SummitBridge's collateral (specifically, the two Patterson Lots, P-16 and P-17) into a planned subdivision consisting of approximately 61 one-acre homesites, with the remainder of SummitBridge's collateral potentially being sold in larger lots, with respect to which the debtor proposed a $10,000 per acre release fee. (Dkt. No. 340) The plan provided for a fixed interest rate of 5.5% per year. On October 6, 2015, the debtor filed a motion seeking approval for a private sale wherein he proposed to sell three parcels (Patterson Lot 16, Patterson Lot 17, and Walker Lot 2) to a third-party buyer at an aggregate sale price of $3,053,875. On October 15, 2015, the debtor filed a First Amended Plan

---

[4] Bellechene Lot 9 ("B-9") is 13 acres, and Bellechene Lot 15 ("B-15") is 10.1 acres. These lots, which (unlike the others) already are separately surveyed, were appraised on July 31, 2013 at $91,000 and $88,000, respectively.

[5] This acreage and appraisal value is, the court presumes, exclusive of the acreage and appraised value of the Farm House Tract, which consists of 13 acres and the debtor's former residence. The debtor intends to convey the Farm House Tract to Wells Fargo Bank in satisfaction of its Class 1 secured claim.

[6] Within this order, the court will refer to the large 142.42 tract as "Tract A-1" and to the smaller, newly platted parcel which includes the barn as the "Barn Lot"; this Barn Lot may also be identified as Lot 5.

3

(Dkt. No. 395) setting out alternative treatments of SummitBridge's claims: Alternative 1 called for an initial buyout of claims pursuant to the proposed sale, which SummitBridge found acceptable, though the sale ultimately did not close and is now the subject of an adversary proceeding filed by the debtor.  SummitBridge objected to Alternative 2 (generally, development of the P-1 and P-2 lots), contending that for myriad reasons, the plan was not feasible, fair, or equitable.  The debtor filed a First Amendment to Plan on December 4, 2015. (Dkt. No. 423)  A subsequent document captioned "First Amended Chapter 11 Plan" was filed on December 10, 1015, but that plan was withdrawn due to "lack of creditor response."  (Dkt. Nos. 428, 441)

SummitBridge filed a motion for relief from stay on February 1, 2016. (Dkt. No. 447)  In a response filed on February 19, 2016, the debtor argued that although there was no equity in the collateral "as is," prior to recombination and development of the real property, SummitBridge still was not entitled to stay relief absent the court's determination that the property was not necessary for the debtor's effective reorganization.  (Dkt. No. 453)  On this point, the debtor argued that "the SummitBridge Collateral is clearly property which the debtor intends to develop and sell as part of his plan of reorganization, without which the Debtor will be unable to pay the SummitBridge Allowed Secured Claims and the Allowed Unsecured Claims in full, with interest."

Also on February 19, 2016, the debtor filed his Second Amended Chapter 11 Plan ("Second Plan") and Disclosure Statement.  In the Second Plan, the debtor proposed to recombine and subdivide the entirety of SummitBridge's collateral into 32  residential lots of at least 10 acres each. The debtor represented that SummitBridge's collateral, though presently appraised at $1,715,000, would upon the filing of the subdivision plat have a gross retail value of approximately $3,108,000, based on projections that lots could be sold at a rate of approximately 7 lots per year for four years,

then 4 lots in the fifth year, at average sale prices ranging from $92,000/lot in the first year to
$105,000/lot in the fifth year.  The debtor proposed a release fee of $80,000/lot, upon receipt of
which SummitBridge would release its lien with respect to that lot.  On March 3, 2016, the debtor
filed a preliminary plat showing the reconfigured collateral.  Objecting ballots were filed by secured
creditors Wells Fargo Bank, N.A. (Wells Fargo), regarding its Class 5 Unsecured Claim, and also
by SummitBridge.

SummitBridge's objections to the Second Plan, which are reasserted with respect to the Third
Plan, include the following:

> The Disclosure Statement is devoid of relevant information concerning the
> proposed development of the SummitBridge real property collateral.  For example,
> the Disclosure Statement anticipates that the development costs of the proposed
> development will be approximately $281,000 or $8,781 per lot.  However, [it]
> provides no breakdown of that expected expense amount or explanation as to how
> that number is derived.  The Disclosure Statement states that the Debtor will be able
> to sell at least 7 ten-acre lots per year, but ... is devoid of any rationale for this
> proposed take-down rate other than the blanket statement that "qualified brokers"
> have suggested that such an absorption rate may be feasible.  The Disclosure
> Statement contains no historical sales information for 10+ acre lots in the general
> vicinity of the SummitBridge collateral.
>
> * * *
>
> . . . For almost a year the Debtor has been proposing to market and sell
> SummitBridge's collateral, but has not produced a single purchase contract.  The
> instant Plan suggests that two existing tracts, Bellechene Lots 9 and 15, are sellable
> as is – they are not dependent upon a new plat being recorded, front on existing
> roads, and can be listed immediately.  If those two lots are so readily sellable, why
> has the Debtor not previously listed and marketed those lots for sale, not to mention
> produced a purchaser for the same?
>
> * * *
>
> First, the Plan is not fair and equitable because it fails to provide for the
> payment of SummitBridge's secured claim in accordance with prevailing market
> terms.  More specifically, the payment of SummitBridge's secured claim, which has
> a loan to value ratio of 1:1, at a proposed fixed interest rate of 5.0% is not a market
> rate of interest for a "development" loan of this nature.

5

The Plan is also not fair and equitable on a more fundamental level – as the entire risk of the proposed development lies squarely on the shoulders of SummitBridge, not the Debtor.

The Debtor proposes to market and sell the SummitBridge collateral in phases. Not surprisingly, the Debtor proposes to sell the low hanging fruit first, particularly Bellechene Lots 9 and 15 which front on existing roads, approximately four lots that front on the existing paved driveway from Efland Cedar Grove Road to the entrance of the Debtor's farm house, and four lots that front on Eno Cemetery Road. Of course, it is possible that if the Debtor's Plan is not as successful as the Debtor anticipates, the readily accessible premium lots will have been liquidated, leaving SummitBridge with interior tracts of land that will necessarily be more difficult to liquidate, potentially less valuable, and that would require substantial infrastructure expense to develop.

The Plan is also not fair and equitable because it is a negatively amortizing plan. The Plan does not propose the payment of any monies (interest, principal or otherwise) to SummitBridge until lots are sold. All the while, SummitBridge, an undersecured creditor, is forced to sit back and receive no payment whatsoever until the first lot sells.

A third risk that SummitBridge faces under the Plan is the potential failure of lot sales. Although the proposed development may possibly have some chance of success, the problem is that all of that risk falls squarely on the shoulders of SummitBridge. Development costs from the project are to be generated largely from sales proceeds above the proposed $80,000 release price for the subject lots. In no uncertain terms, the Plan compels SummitBridge to invest in the Debtor's development project and to accept that investment in lieu of its present rights as a secured creditor.

Objection to Second Plan at ¶¶ 7, 13, 15, 16-19 (footnotes omitted). (Dkt. No. 471) For all these reasons, SummitBridge argued that the Second Plan was not feasible. Both SummitBridge and Wells Fargo (which holds a Class 1 secured claim as well as unsecured claims) filed ballots rejecting the Second Plan.

The debtor subsequently proposed his Third Amended Plan ("Third Plan"), which is the plan presently under consideration. The proposed treatment of SummitBridge's claim in the Third Plan is as follows:

5.4.2   The Class 4 Allowed Secured Claim shall bear interest from the Effective Date at a fixed rate of 5.50% per annum.  Until such time as the Class 5 Allowed Unsecured Claims have been paid in full, payments on the Class 4 Allowed Secured Claim shall be made solely by means of (i) Release Fee for the Barn Lot ($100,000) by payment from the Debtor's exempt assets within 30 days after the Effective Date, (ii) Release Fee for the Open Space Lot ($50,000) by payment from Net Sales Proceeds or, in the Debtor's discretion, by means of a loan from the Debtor, upon the recordation of a plat showing the Open Space Lot but no later than 4 years after the Effective Date, and (iii) Release Fees ($80,000 per Lot) by payment at closing from the Net Sale Proceeds of SummitBridge Lots.

Generally speaking, the debtor contends that this Third Plan addresses and should alleviate SummitBridge's predominant concerns in that it incorporates a higher interest rate, provides for an initial payment of $100,000 to SummitBridge, and demonstrates the debtor's commitment to meeting sales projections and generally enhancing the marketability of the proposed development by designating two lots intended to be used in whole or in part as amenities. Wells Fargo accepted the Third Plan.

SummitBridge again objected, based on the grounds that it previously asserted (discussed above), as well as several new ones.  Its concerns were addressed during the May 26th hearing, during which the court heard testimony in support of the plan from the debtor and from Cindy McIntyre, a broker with Coldwell Banker Howard Perry and Walston.[7]  SummitBridge introduced testimony from by Thomas McGoldrick, an independent contractor with ABTV (a turnaround and restructuring firm), and Chuck Munn of LandTech Asset Management, both of whom were retained by SummitBridge to evaluate the debtor's plans.  Both Mr. McGoldrick and Mr. Munn were

---

[7]  The May 26th hearing on conditional approval of the plan and disclosure statement included additional testimony in support of the Third Plan, but that is not addressed here.  This order concentrates on SummitBridge's objections to the treatment of its collateral, and the discussion herein is limited to the facts and law relevant to disposition of SummitBridge's motion and objections.

accepted as expert witnesses without objection by the debtor, and their reports were admitted into evidence.

The debtor's testimony, to the extent relevant to the issues raised by SummitBridge, established the following: The SummitBridge collateral presently is appraised at $1.17 million, which reflects the value of large tracts of land and requires pricing lower than if selling smaller tracts. Once apportioned into 32 residential lots and two other lots (the Barn Lot and the Open Lot), the reconfiguration will "create equity" such that the collateral will, upon recordation of the plat, be worth approximately $3.35 million. Each of the 32 lots will be just over 10 acres, with the possible exception of one lot. Using exempt retirement funds, the debtor will pay a $100,000 release fee to SummitBridge to accomplish a purchase of the Barn Lot by the debtor's wholly-owned entity, Faison Family Farms, LLC. This lot, the debtor testified, would "dramatically enhance" the marketability and value of the subdivision if used as an amenity along with the Open Lot, which (because it is bisected by a creek and is unbuildable) the debtor proposes to use for walking and viewing wildlife. The debtor contemplates that the Barn Lot would be used "in part" as an amenity, with terms of use being pursuant to a long term lease by his LLC to a future property owners' association.

The debtor testified that he will market the lots fronting on existing roads first, because these require no further development or other infrastructure and thus are ready for immediate sale. Under the Third Plan, the net proceeds received from sales will fund development of remaining lots. The development process envisioned by the debtor consists of determining whether the lots as preliminarily platted can each support a septic system, then having surveyors put in posts, at which point they will be ready to go. Road development will be undertaken as needed and as lots sell, and

8

assuming the "easy lots" sell first, subsequent development will be "driven by what the market is telling us."  The debtor anticipates that lots with the large A-1 "Barn Tract" will sell first, and that the last lots to be marketed and sold will be the four interior lots which front the large pond in the Patterson 16 parcel.  The debtor considers those lots to be his "very best product."  These lots are situated between a large pond and the 17-acre Open Lot "wilderness tract," which the debtor views as a "huge selling point" in that purchasers of a lot abutting the Open Lot could buy 10 acres but have access to 27 acres. Regarding anticipated sales generally, the debtor testified that his projections with respect to both sell rates and sales prices are based upon a market study that he requested from Ms. McIntyre.  He explained that he asked her to determine the level of demand and what the prices should be, received an email from her relaying that information, and that he used those results in his budget.

On cross-examination, the debtor acknowledged that use of the Barn Lot and Open Lot as amenities was not expressly included in the plan, and he could not recall whether he was actually obligated under the plan to devote those properties to that purpose.  It was, he testified, "certainly something we intend to do," because "you have to, to sell it."  The debtor testified that he was approximately "25 pages in" to the process of drafting covenants and restrictions pertaining to use and development of the amenities.  He confirmed that he would prefer not to sell any acreage, especially in the large A-1 "Barn Tract," because he likes his farm.  If there was "a way to do this and still preserve a portion of the farm," he would do that.  In particular, he testified that he's been told that developing the property is necessary in order to get everyone paid, but that if he "could find another way to do it, [he] absolutely would."  The debtor testified that he has sole discretion with respect to which lots are sold and when.

The debtor testified that he did not "test the waters" by marketing either of the Bellechene lots during the pendency of the bankruptcy case because he didn't have the court or SummitBridge's approval and thus believed he had no authority to do so.[8] Further, the debtor stated, "Ms. McIntyre has a good handle on the market" such that his plan reflects current and accurate information about the market. Regarding the payment of interest, the debtor proposes to pay it annually, and stated that his $100,000 up front payment exceeded the interest for the first year. The debtor testified that the plan would "create a huge equity cushion" for SummitBridge.

Asked about a retention provision he added to the listing agreement, which would permit the debtor to retain seven or more lots of his choosing for purchase with no commission fee, and specifically whether anything would prevent him from purchasing the Barn Lot as well as another lot, and then building a nice house on it, the debtor replied, "Nothing but money." Asked why he didn't propose to let SummitBridge retain its lien on the Barn Lot until successful completion of the plan, the debtor stated that the Barn Lot and its riding facilities would necessarily be used as a facility available "in part" for the owners of the rest of the lots, and that based on professional advice he'd received from a realtor, the Barn Lot needed to be out from under a mortgage "so the POA can have it with the comfort that it's not going anywhere, ever." The debtor testified that he had hoped to get the Barn Lot for $80,000 pursuant to the Second Plan, but now proposed to immediately pay a higher release fee for it under the Third Plan to make SummitBridge happy.

The debtor agreed that the two properties already surveyed, Bellechene 9 and 15, had been appraised at $91k and $88k, respectively; pursuant to the Third Plan, SummitBridge is to release its

---

[8] The debtor found a prospective buyer for a portion of SummitBridge's collateral (Patterson 16 and 17, and Walker Lot 2) in October 2015, and then sought and obtained the court's approval of the sale, which later fell through.

lien as to each of those lots upon payment to it of the $80,000 release price. Asked whether the Third Plan would result in a loss to SummitBridge if, for example, only one property sold, such that SummitBridge had to foreclose, the debtor stated that such a result was possible but highly improbable and "wouldn't happen." Regarding development costs, he testified that the costs of surveying and platting the reconfigured property would be relatively nominal, at approximately $1,500; this number is not an estimate, he testified, but rather the amount that a surveyor with whom he spoke told him that he should expect other companies to charge.

Ms. McIntyre testified that she was familiar with the property, having been involved with discussions pertaining to its sale for about a year. Ms. McIntyre undertook a market analysis by looking at similar properties in the debtor's market area, which is Northern Orange County. Based on her review of legal information and the local MLS for properties within the market area, she calculated the appropriate average market price for the property (once reconfigured) and the likely number of days on the market. Ms. McIntyre stated that it would be necessary to reevaluate those calculations after getting a few sales on the books by assessing how long those sales took and determining what else was out there. Based in part on a recent "fire sale" in a neighborhood, where a seller got rid of a lot of 10-acre tracts, Ms. McIntyre determined that the market "is there" and that people are interested in that kind of development.

Regarding the Barn Lot and Open Lot, Ms. McIntyre testified that having such amenities is "very important," that they were would be "a huge selling point," and also were "unlike anything else we have in Orange County." Also significant is the proximity of some lots to water, as well as the ability to be able to have access to Lake Orange, which is a "huge draw." Ms. McIntyre testified that the debtor "owns a part of that" Lake Orange access, such that it might be possible to put a dock

11

and potentially additional parking spaces there, along with kayaks and fishing poles and the like.[9] She confirmed that the Patterson-16 tract lots, which are waterfront in that they front a large pond, would be the most expensive of the proposed lots and also would require the most extensive development in order to be marketable.

On cross-examination, Ms. McIntyre acknowledged that she had an incentive in getting the plan confirmed because confirmation was required for "payday." Regarding the debtor's reservation of his ability to purchase seven or more lots without paying commission on those sales, she testified that sellers sometimes do want to exclude properties from a sale in order to keep those properties for their own use. She did not know which lots those would be. She believes the debtor has "thought it out and which lots he wants to start with first," and that it "makes sense the way he's done it." Asked about the value of the lots on the existing roads as compared to those on the interior of the tracts, she stated that "If you can sell the exterior, you can sell the interior." If the proposed amenities were not provided, Ms. McIntyre testified, that would affect the saleability of the lots and the subdivision as a whole. She offered that her approach to everything was to look at the negatives, and then determine how to turn those negatives into positives.

---

[9] Other than Ms. McIntyre's testimony and the handwritten reservation of purchase rights in the listing agreement, which describes the proposed new subdivision as including "one barn tract + 17 acres of wildlife and common area *plus a lake access area*," it is not readily apparent from the evidence before the court that the debtor owns access to Lake Orange. (Emphasis added). Ms. McIntyre noted that the four interior lots in the Patterson-16 tract front onto a pond, *not* Lake Orange, so the lake access would necessarily come from a different lot (or lots). Per the preliminary plat submitted by the debtor, Lot 8 appears to be the most likely source of such access, though the court has no way to be sure. In any event, the debtor has an area or areas in mind, as he indicated in his memorandum of final arguments that he intends to retain the ability to make modifications to the development plat to reserve easements and possibly create small common areas near or adjacent to "water amenities." The court urges the debtor to provide additional information about the nature of these potential amenities in support of his next plan.

12

SummitBridge offered the written reports and testimony of two witnesses, Thomas McCormick and Chuck Munn, both of whom were accepted as experts with respect to interest rates and the market for the SummitBridge collateral. Mr. McCormick testified primarily with respect to calculations of the appropriate interest rate, using the formula set out in *Till v. SCS Credit Corp.*, 541 U.S. 465 (2004). He testified that the interest rate under the *Till* formula approach should be 7.5%, not 5.5% as set out in the Third Plan. Mr. Munn's testimony and report focused on the unique aspects of the real property along with its likely marketability and the projected costs and other steps involved in the proposed development. Mr. Munn described a prospective buyer for the property as "absolutely a retail purchaser," because "speculative loans are near impossible to get for builders." He testified that because a significant percentage of the property is in a flood zone and/or has water features, the process of securing the necessary permits and approvals and ultimately developing the property will be more complicated and expensive[10] than is currently projected in the debtor's plan and proffered budgets. Mr. Munn thought it likely that the large lot size could facilitate successful installation of a septic system somewhere on each lot, subject to potentially redrawing the property lines if, ultimately, the soil didn't perk and/or the topography proved to be too steep to be appropriate for a home site. He concluded that the debtor's projections underestimated both the cost and the breadth of the engineering required to build a road (or bridge) through the Open Lot. Without access, that amenity would not be available and the "most valuable" interior tracts would be inaccessible.

---

[10] Mr. Munn projected development costs of approximately $330,000 with a $40,000 contingency, which is approximately $100,000 more than the debtor's projections; *i.e.*, Mr. Munn concluded that the debtor's anticipated development costs are understated by approximately 30%.

Regarding the projected sale prices of the lots, Mr. Munn testified that based on his review of reported sales and current listings in Northern Orange County, a $75,000 to $85,000 price range was more realistic for the tracts than the list price of $92,000 anticipated by Ms. McIntyre. Ultimately, Mr. Munn concluded in both his testimony and in his report, while an $80,000 per lot *selling* price (not release price) potentially could be achieved, that sales price (some 18% lower than anticipated by the debtor) – together with development costs (some 30% higher than projected by the debtor), together with payment on interest, ultimately would generate approximately $110,000 in "excess funds" over the five year life of the project, creating the thinnest of margins.[11]

## DISCUSSION

The parties agree that all of the requirements of § 1129(a), except those under §§ 1129(a)(3) and (11), have been satisfied. The debtor must establish that the Third Plan is feasible under § 1129(a)(11), and the court must determine that the plan is offered in good faith per § 1129(a)(3). The burden of establishing the feasibility of a proffered plan of reorganization is on the debtor, and – like good faith – must be satisfied by a preponderance of the evidence. *See, e.g., In re Thomas Properties II Ltd. P'ship*, 241 F.3d 959, 963 (8th Cir. 2001). While the term "good faith" is not defined in the Bankruptcy Code, § 1129(a)(3) requires that the plan be "proposed in good faith and not by any means forbidden by law." As this court recently observed in a chapter 11 cramdown case

---

[11] This scenario envisions the debtor's sale of lots at the rate of seven per year; however, per Mr. Munn's report, "[w]ith respect to absorption, there is nothing in the available data to give any high degree of confidence that the debtor can achieve a sales pace of seven lots per year. Anything less than seven lot sales per year, at the aforementioned sales price, will not yield sufficient proceeds to meet the minimum annual debt release requirement." SummitBridge Ex. D at 22. Moreover, Mr. Munn also testified that it was possible that the debtor might "lose a lot or two" as a result of the engineering and surveying process, given the prevalence of creeks and other water features as illustrated by the hydrology and floodplain maps.

comparable in many respects to this one, courts "generally have interpreted [good faith] to mean there is a 'reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code.'" *In re Bate Land & Timber, LLC*, 523 B.R. 483, 492 (Bankr. E.D.N.C. 2015), *quoting In re Madison Hotel Assocs.*, 749 F.2d 410, 425 (7th Cir. 1984 (internal quotations omitted)). In conducting its inquiry, the court "must view the plan in light of the totality of the circumstances surrounding the proposal of the plan." *Id.* at 493 (citing *In re Piece Goods Shops Co.*, 188 B.R. 778, 790 (Bankr. M.D.N.C. 1995), and *Behrman v. Nat'l Heritage Foundation Inc.*, 663 F.3d 704 (4th Cir. 2011)).

Assuming the debtor is able to satisfy § 1129(a), he also must establish that his plan satisfies one of the three requirements of 11 U.S.C. § 1129(b)(2)(A), because he seeks confirmation of it over the objection of SummitBridge. Section 1129(b)(2)(A) requires that with respect to a class of secured claims, the plan must provide:

> (i)(I)  that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and
>
>   (II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in the property;
>
> (ii) for the sale, subject to section 363(k) of this title, of any such property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or
>
> (iii) for the realization by such holders of the indubitable equivalent of such claims.

SummitBridge objects to the Third Plan on multiple grounds, arguing that the plan is neither feasible nor proposed in good faith; instead, SummitBridge contends, the debtor's plan is little more than a "visionary scheme" based on speculation and unsupported predictions rather than objective

15

fact.  *See, e.g., In re Seasons Partners, LLC*, 439 B.R. 505, 515 (Bankr. D. Az. 2010).  Regarding cramdown, SummitBridge argues that because its claim is impaired and SummitBridge does not accept the Third Plan, the plan cannot satisfy §1129(a)(8).  The debtor may confirm his plan using the cramdown mechanism of § 1129(b) if he can establish its "compliance with every requirement under § 1129(a) *other* than §1129(a)(8)," and "so long as the plan does not discriminate unfairly and is fair and equitable to the classes not accepting the plan." *Bate Land & Timber*, 523 B.R. at 491. Here, SummitBridge contends that the plan is not fair and equitable as required by § 1129(b), fails to ensure SummitBridge is adequately protected, and does not provide to SummitBridge the indubitable equivalent of its claim.   As with determinations made under § 1129(a), the preponderance of evidence standard also applies in the context of issues arising under § 1129(b). *Id.* at 489-91 (discussing and citing *In re Briscoe Enters., Ltd.*, 994 F.2d 1160, 1163-64 (5th Cir. 1993), *cert. denied*, 510 U.S. 992 (1993), among other cases).

## I.    Section 1129(a) - Feasibility and Good Faith

The feasibility requirement of § 1129(a)(11) mandates that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." As discussed above, the plan also must be proposed in good faith. Here, SummitBridge's objections to the plan are simultaneously relevant to both requirements.

In a nutshell, SummitBridge contends that the Third Plan is a "visionary scheme" that is "based on speculation, hope and desire, and has no demonstrable objective fact or facts as its foundation." SummitBridge Objection at 4 (Dkt. No. 471).  Specifically:

> The foundation of the Debtor's Plan is the sale of unimproved real property
> in Orange County, Wake County, and Vance County, North Carolina, with the great

16

bulk of such proposed [sales] consisting of SummitBridge's real property collateral in Orange County, North Carolina.  Presently, none of the subject tracts are listed for sale.  The sole foundation of the Debtor's proposal to sell SummitBridge's collateral in ten-acre lots is that "the Debtor has consulted with qualified brokers who have investigated the existing inventory and absorption rate for 10-acre residential tracts in the vicinity of the SummitBridge Collateral, and based upon their advice [the Debtor] has concluded that the SummitBridge Lots can be sold at the rate of approximately 7 lots or more per year with an average sale price ranging from $92,000 to $105,000."

*Id.* (quoting Debtor's Disclosure Statement to Second Amended Plan at 14).  The debtor did not pursue an independent feasibility analysis of the development; SummitBridge, however, did.

Having considered the evidence offered by both the debtor and SummitBridge, the court determines that the Third Plan is not feasible. This finding is based in large part on the lack of sufficient reliable evidence to support the debtor's projections, which, together with the many self-serving aspects of the Third Plan and the shifting of the  risk of development to SummitBridge, also precludes the court from finding that the plan is offered in good faith.  The court is in agreement with many of the concerns and issues raised by SummitBridge, and would add a few of its own.  The factors leading to the court's conclusions that the plan is not feasible or filed in good faith are set out below, and its comments are intended to serve another purpose as well: to provide suggestions that may form the basis of a confirmable plan, because the court believes that the debtor *could* in fact propose a confirmable plan.  These factors are:

1.  The Debtor's proposed treatment of all 32 proposed lots as fungible for purposes of the $80,000 release price, irrespective of each lot's unique features, the value of the lot relative to the other lots and proximity to amenities, and the development costs with respect to that lot, is, on its face, unreasonable and is not supported by the testimony.

2.  There is a lack of evidence providing necessary information about property features that are both unique to the real property and crucial to the success of any development.  For example, while the "upper" and "lower" tracts are described as being contiguous, the maps provided to the court suggest that perhaps they are not – specifically, while proposed Lots 8 (lower tract) and 28 (upper tract) clearly are in close proximity to each other, it is not apparent from the maps that they share a property boundary. Because the debtor's testimony and his plan of reorganization contemplates a single development, and the upper and lower tracts each contain a proposed distinctive amenity, the debtor must provide further details of how, to what extent, and when the debtor proposes to provide access to amenities as between the upper and lower tracts.  Similarly, the debtor should provide additional information about access to Lake Orange from the SummitBridge collateral.

3.  The feasibility of the plan rests on the accuracy of the debtor's sales projections, as well as projected expenses.  The debtor testified that the plan's projected sales and absorption rate were based on information and data provided to him by Ms. McIntyre, whom he retained as the listing agent for the SummitBridge collateral.   The court's impression of Ms. McIntyre's testimony was that these sales projections were derived from her experience and familiarity with past and current listings within the Orange County market.  However, there was no suggestion that she has any special expertise or track record in not only selling property, but also in accurately calculating and forecasting the sale prices for a still-prospective development.  Moreover, she indicated that the plan to market and sell the property in phases was the *debtor's* plan,  rather than hers.  The debtor has some experience in real estate development but is not a developer as such, and he in turn had testified that his sales numbers and marketing plan were based on *Ms. McIntyre's* predictions.  It is

incumbent on the debtor to establish the feasibility of his plan based on a preponderance of the evidence, and here, the debtor and Ms. McIntyre appear to have a somewhat circular reliance on the other's plans and expertise. Furthermore, specificity as to development costs was sorely missing in the debtor's testimony.

4. The court is persuaded by the report and testimony offered by Mr. Mann that there is a strong likelihood that development of the property, particularly with respect to engineering aspects, will incur higher costs than anticipated by the debtor and likely will require adjustments to the tracts as they currently are preliminarily platted. That may require reconfiguration or potential consolidation of the proposed lots. An occurrence of that sort is not unheard of and would not necessarily derail an otherwise feasible plan, but here, where the debtor's Third Plan lacks a meaningful equity cushion and there is no backup measure in place for such an event, the loss of even one of the 32 projected lots would dramatically impact the debtor's proposed budget and plan.

5. The debtor's addition to the Listing Agreement ("Seller may select 7 OR MORE lots to retain on which no commission will be paid") is problematic. This specification is not mentioned (much less explained) in the debtor's plan or disclosure statement, but it is unacceptable to the extent that it would permit the debtor to acquire SummitBridge's collateral at prices set by the debtor, without exposure to the market, and without an opportunity for SummitBridge to credit bid. And, SummitBridge has challenged the debtor's good faith and expressed its concerns about the significant discretion afforded to the debtor under the Third Plan; the self-purchase provision exacerbates those concerns by adding a new layer of discretion atop the first one.[12] An indication

---

[12] The debtor acknowledged during his testimony that the type of purchases allowed by the Listing Agreement's self-purchase provision potentially could "cut the collateral in half," depending on which lots he purchased. He also testified that he wouldn't do that.

of which lots the debtor proposes to retain in order of preference would allow the court to evaluate the true effect of that retention on the security interest/adequate protection of SummitBridge. There is no equity in the collateral as it is, so, protections during the selldown must be afforded to SummitBridge.

6. SummitBridge's challenges to the debtor's good faith are based in large part on these open-ended scenarios, which the debtor has created, but also could resolve. SummitBridge's list of potential scenarios includes the following: 1) The debtor uses his considerable cash reserves to purchase prime lots, leaving SummitBridge with a less appealing property mix; 2) The debtor purchases his favored lots, SummitBridge releases its liens on them, and the debtor defaults, leaving SummitBridge to foreclose on collateral including less desirable lots and/or those requiring the most extensive (and expensive) infrastructure; and 3) The debtor purchases property near or adjoining the Barn Lot, and fails to incorporate the Barn Lot as an active amenity.  It may be possible for the debtor to retain some sort of self-purchase opportunity in the listing agreement that would be acceptable to SummitBridge; indeed, the debtor's genuine interest in ensuring that the property is developed to a high standard *could* align with, and even advance, SummitBridge's interests. However, that would require more specification from the debtor, in writing, as to what he does and does not intend to do. SummitBridge's concerns and its insistence on having some say in the disposition of its collateral are reasonable.

7. The debtor makes much of the value that dedication of the Barn Lot and Open Lot as project amenities would give to the development, but fails to clearly and unequivocally dedicate that property to the project in his plan.  Furthermore, the debtor seeks to purchase the property, free and clear of the security interest of SummitBridge, through a related entity, at a price for which he offers

no valuation testimony.   The court might look more favorably upon such a proposal if it aligned with a delay in the release of SummitBridge's security interest until after the sale of some required number of lots, such that dedication of these amenities would have a real purpose and add value to the development, thus enhancing the value of SummitBridge's remaining collateral.

8.   The court notes that the lack of an "as built" appraisal in support of the debtor's prediction of value (and the equity cushion he espouses) severely prejudices his ability to persuade the court of the feasibility of his plan.

At present,  the totality of the circumstances surrounding the Third Plan fall short of the overt indicia of good faith that the court would expect to see.   Nor has the debtor established, by a preponderance of the evidence, that the plan is unlikely to be followed by either liquidation or the need for further reorganization.  Accordingly, the court will not confirm the Third Plan, but instead recommends that the debtor file an amended plan which, if it is responsive to the comments set forth above, may well satisfy the requirements of § 1129(a).

## II.    Cramdown under 11 U.S.C. § 1129(b)(2)(A)

In light of the court's findings with respect to feasibility and good faith, the Third Plan is not confirmable and it is not necessary to address whether the debtor's plan can satisfy the cramdown provisions of  § 1129(b)(2)(A).   However, assuming that the debtor is able to put forth a plan that is feasible, in good faith and otherwise in compliance with all aspects of § 1129(a) other than § 1129(a)(8), the court includes the following observations in hopes that they provide useful insights into the court's current thinking regarding the debtor's efforts to comply with § 1129(b)(2)(A).

### A.    The Barn Lot

SummitBridge argues that with respect to the debtor's proposal to purchase the Barn Lot (this being property that the debtor currently owns, subject to SummitBridge's lien) for a release price of $100,000, the debtor cannot not satisfy any of the cramdown provisions of § 1129(b)(2)(A). The Third Plan does not permit SummitBridge to retain its lien on that lot, which precludes application of § 1129(b)(2)(A)(i). The debtor's current ownership of that property, coupled with SummitBridge's inability to credit bid under the plan, precludes application of § 1129(b)(2)(A)(ii). So, the $100,000 proposed payment for the Barn Lot would pass muster only if it provided to SummitBridge the indubitable equivalent of its claim under § 1129(b)(2)(A)(iii).

As SummitBridge also points out, the debtor has offered no evidence of the value of the Barn Lot, which features infrastructure not present on the other lots (a large barn that includes an office plus stalls and storage facilities, as well as riding rings and a gazebo). Given that the debtor proposes to sell the remaining lots at a minimum price of $92,000, his proposal to pay $100,000 for the Barn Lot implicitly allocates to those facilities the negligible value of $8,000. In addition, this particular lot is benefitted by an existing gravel road and is the most "ready for use" of all the SummitBridge collateral. Presumably, the Barn Lot has ample room for a home site as well. Because there is no evidence *at all* as to the fair market value of the Barn Lot, there is no basis upon which the court could conclude that the debtor's proposed $100,000 release fee payment provided to SummitBridge the indubitable equivalent of its claim. It is incumbent on the debtor to provide that evidence.

The court notes that based on all the circumstances of this case and the evidence introduced thus far, it is highly unlikely that court would approve of the debtor's acquisition of the Barn Lot (or any other lot) from SummitBridge without SummitBridge's retention of its lien. The debtor's

testimony that he seeks release of the lien because a future property owner's association would want the Barn Lot, as an amenity, to be out from under a mortgage to SummitBridge is unpersuasive. And, while the debtor potentially may do a partial surrender under § 1129(b), it is incumbent on the debtor to prove valuation.

### B.    Release Prices and Credit Bidding Generally

Briefly, and without reaching any conclusions of law at this time, the court notes that SummitBridge provided citation to many recent cases that would appear to preclude the debtor's proposed arrangement, which pairs below-fair-market-value release prices with no right to credit bid.  *See, e.g., Radlax Gateway Hotel v. Amalgamated Bank,* 132 S. Ct. 2065 (2012); *In re Investment Co. of the Southwest, Inc.*, 341 B.R. 298 (10th Cir. 2006); *In re Olde Prairie Block Owner, LLC*, 464 B.R. 337 (Bankr. N.D. Ill. 2011).  The debtor maintains that "[t]he evidence presented to the Court established the adequacy of the release price, and there was no evidence presented which would support a finding that undue risk has been shifted to the secured creditor." Debtor's Final Argument Regarding Confirmation of Third Amended Plan of Reorganization at 3. To the contrary, as discussed above, the evidence did not establish the adequacy of the release prices; further, the court could not find that the Third Plan was offered in good faith largely because that plan, and the circumstances surrounding it, shifted undue risks to SummitBridge.

**CONCLUSION**

For the foregoing reasons, confirmation of the debtors' Third Amended Plan of Reorganization is **DENIED**. The debtor may file an amended plan within 20 days of this order.

SummitBridge's motion for relief from stay is **DENIED** without prejudice.

**END OF DOCUMENT**