**SO ORDERED.**

**SIGNED this 21 day of September, 2018.**

_____
**David M. Warren**
**United States Bankruptcy Judge**

_____

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NORTH CAROLINA
RALEIGH DIVISION

IN RE:                                                          CASE NO. 14-00073-5-SWH

**OLLIE WILLIAM FAISON**
                                                                CHAPTER 11
        **DEBTOR**


### ORDER REGARDING REPORT OF PUBLIC SALE

This matter comes before the court upon the Report of Public Sale and Request for Hearing [Wake County Property] ("Report") filed by Ollie William Faison ("Debtor") on August 21, 2018. The court conducted a hearing on September 4, 2018 in Raleigh, North Carolina. John A. Northen, Esq. appeared for the Debtor, William P. Janvier, Esq. appeared for Marlowe & Moye, LLC ("Marlowe & Moye"), and the United States Bankruptcy Administrator Marjorie K. Lynch, Esq. ("BA") appeared on her own behalf. Based upon the evidence presented and arguments of counsel, the court finds as follows:

## BACKGROUND

The Debtor filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code[1] on January 3, 2014 and is operating pursuant to his Fifth Amended Plan of Reorganization ("Plan"), confirmed by the court on November 15, 2016.

At the time of his petition, the Debtor and his two siblings owned as tenants-in-common approximately 120.63 acres of unencumbered real property located in Wake County, North Carolina. Pursuant to an Order Authorizing Partition of Real Property entered on February 5, 2016, the Debtor and his siblings partitioned their ownership of this property, resulting in the Debtor obtaining in fee simple approximately 40.35 acres known as the Woodfield tract and defined in the Plan as the "Wake County Property."

The Plan provides for designated payments to the Class 5 Allowed Unsecured Claims to be secured by a first lien deed of trust upon the Wake County Property and requires the Debtor to list with a broker and sell the Wake County Property as soon as reasonably possible. The Debtor was unsuccessful in procuring a contract for the private sale of the Wake County Property and decided instead to offer the Wake County Property for sale at public auction, a process which is neither contemplated nor prohibited in the Plan.

On June 25, 2018, upon motion of the Debtor, the court entered an Order Authorizing Debtor to Employ Iron Horse Auction Co., Inc. which allowed the Debtor to employ Iron Horse Auction Company, Inc. ("Iron Horse") pursuant to § 327(a) to market and sell the Wake County Property at public sale, with Iron Horse being allowed a six percent (6%) commission plus an advanced payment of $3,800.00 for the costs of advertising the sale. Upon additional motion of the Debtor, on July 12, 2018, the court entered an Order Granting Motion to Authorize Public Sale

---

[1] Except for formal citations, references to the Bankruptcy Code, 11 U.S.C. § 101 *et seq.*, will be by section number only.

("Sale Order") which authorized Iron Horse to auction the Wake County Property pursuant to § 363. The Sale Order states that Wake County Property would be offered as a single parcel and alternatively in three or four separate tracts, with Iron Horse selling in the configuration that would generate the highest gross sale price.

Iron Horse conducted a public auction on August 15, 2018, and Marlowe & Moye was the highest bidder for the Wake County Property as a single parcel for $577,000.00. This amount is significantly higher than the aggregate amount of $139,000.00 for the highest bids for the Wake County Property as separate parcels. Timothy A. Griffin was the second highest bidder for the Wake County Property as a single parcel for $571,000.00. In the Report, the Debtor discloses that his counsel was informed by Iron Horse that Marlowe & Moye may have colluded with or attempted to collude with Mr. Griffin and may have paid or attempted to pay money to Mr. Griffin to cease competitive bidding.

The Debtor testified that he first began marketing the Wake County Property in 2014 prior to his bankruptcy filing and continued the marketing as part of his Chapter 11 reorganization. In 2016, he received a conditional offer from Marlowe & Moye to purchase the Wake County Property for $1,110,000.00, a price which was comparable with appraisals of the property around that time; however, the Town of Knightdale impeded development prospects by putting a limited access road through the Wake County Property. Marlowe & Moye was unable to procure a change of this access with the Town of Knightdale and properly withdrew its offer. Two other developers expressed similar interest in the Wake County Property but declined to make offers due to the limited access road. Based upon the inability to sell the Wake County Property privately after marketing it for approximately four years, the Debtor resorted to public auction and believes that anything higher than $570,000.00 is a fair price for the Wake County Property.

Iron Horse representatives Thomas McInnis, Chris Crawford, and Hobart Frye were present and worked at the auction of the Wake County Property. At the hearing each testified about the auction process and their observations surrounding the perceived collusion between the principals of Marlowe & Moye and Mr. Griffin. Stewart Marlowe was present for the entire auction and bid on behalf of Marlowe & Moye. Howard Moye appeared for some period and may have also bid on behalf of Marlowe & Moye. The testimony was inconclusive on Mr. Moye's participation in the auction.

Iron Horse accepted bids through the Internet and at the auction site. The auction required a lapse of ten minutes after each bid to allow for subsequent bidding, and if no bid was received within this "quiet period," then the Wake County Property would be sold to the highest bidder. If a bidder placed a bid during the "quiet period," then the ten-minute "quiet period" would start over until no further bids were made during the final ten-minute "quiet period."

During one of these "quiet periods," Mr. Marlowe inquired of Mr. McInnis about the identity of Mr. Griffin. Mr. McInnis cautioned Mr. Marlowe about communicating with other bidders while the auction was pending. Both Mr. Marlowe and Mr. Griffin left the auction room together. It is not clear when Mr. Griffin and Mr. Marlowe returned, but at some point, Mr. Griffin left the premises for a personal errand but continued bidding by telephone. Later, after Mr. Griffin returned, Mr. Crawford observed Mr. Marlowe and Mr. Griffin exchanging documents and perhaps a check. Thereafter, Mr. Griffin ceased bidding, and Marlowe & Moye was designated the highest bidder. Mr. Frye testified that although it was Iron Horse's custom to audio-record or video-record its auctions, sometimes the equipment will not work at a particular site but failed to elaborate on the inoperability of the recording equipment. Mr. Frye was unaware of any recording

4

of the auction of the Wake County Property. Mr. McInnis and Mr. Crawford never addressed whether a recording exists.

## DISCUSSION

The Debtor disclosed the actions of the bidders to the court as a measure of caution and good faith, relying on Iron Horse's perceptions. This court demands and expects integrity in its auctions. The allegations made by Iron Horse are alarming, but without more substantiation, the court cannot and will not pursue assumptions.

Surprisingly, neither the Debtor nor the BA issued subpoenas for Mr. Griffin, Mr. Marlowe, and Mr. Moye to appear and testify. Having them examined by the parties would have been the best method to determine if any bid collusion had occurred. Even an investigation through a non-judicial inquiry would have been helpful. Instead, Iron Horse's assumptions of collusion and impropriety were pure conjecture and speculation. The BA urged the court to deny confirmation of the public sale pursuant to § 363(n) which allows avoidance of a sale under § 363 if the sale price was controlled by an agreement among potential bidders at such sale. If that is the BA's position, then she should have provided evidence.

At the conclusion of the hearing, the court announced that it could not find bid collusion based upon the speculative evidence presented, especially given the amount of the purchase price. The court opined further that the way Iron Horse conducted the auction contributed to an environment for bid collusion. The court stated that it would consequently reduce Iron Horse's commission to three percent (3%). Since the hearing, the court has decided not to reduce the compensation to Iron Horse, because even though it conducted a flawed auction, it acted responsibly in reporting the matter to the court. The court will use this Order to instruct those auctioneers, who should know better, on a proper auction to be conducted under the authority of

this court. The court specifically condemns the following: using "quiet periods" which welcome and entice bid collusion; allowing bidders to leave not only the auction room but the auction premises; accepting telephone bids; and failing to record the auction proceedings.

An auction should move quickly and be a series of competing bids. If bids cease, then the hammer should fall after a final notice. Taking a break or allowing for a "quiet period" interrupts the flow of the process and allows those present, unless properly monitored, to engage in unacceptable public auction behavior.

Bidders should never be allowed to leave the immediate auction area. In this day of cell phones, live streaming, email, and text communication, no one should ever have to leave an auction room to get instructions from a client or from a superior. The revolving door in this auction venue was a petri dish for bidders wishing to engage in questionable auction behavior.

Telephone bids should be used sparingly. The communication between the auctioneer who is on the telephone with a bidder, to the exclusion of those attending the auction in person, creates an appearance of impropriety. Using the Internet is acceptable if the auction is solely an Internet auction, or as in this case, an Internet auction followed by a live auction. Still, auctioneers must be careful with using an Internet auction. All bidders must be visible to each other with ultimate transparency.

Finally, *always* record the sale. Even the most amateur auctioneer, including a foreclosure trustee under a power of sale, generally records a sale with active bidders. Of all the mistakes Iron Horse made, this fundamental error is the most incredulous. The court can find no excuse for failing to record the sale. If Iron Horse wants to be employed as a professional in this court, it needs to repair the existing recording equipment or purchase a new system. Even if the equipment failed the day of the sale, Iron Horse surely had a contingency plan. Most cell phones have audio-

recording and video-recording capability, and between Messrs. McInnis, Crawford and Frye, odds are very high that one of them had that cell phone technology, or at least they should have.

The parties, including Iron Horse and the Debtor, in particular, believe that Marlowe & Moye's high bid of $577,000.00 is a fair price for the Wake County Property. The Debtor would be the most vocal critic if he believed collusion existed to depress the sale price. Not only does the Debtor not object, he supports the sale and wants it to close as soon as possible. He is relying on the proceeds to fund a payment of $300,000.00 due under the Plan to the Class 5 unsecured creditors on December 1, 2018. Marlowe & Moye is ready, willing and able to close its purchase of the Wake County Property, and that closing should occur; now therefore,

It is ORDERED, ADJUDGED, and DECREED as follows:

1. The BA's request to avoid the public auction sale of the Wake County Property be, and hereby is, denied;

2. The Debtor and Marlowe & Moye may proceed with closing the sale of the Wake County Property pursuant to the Sale Order; and

3. Iron Horse may receive its commission in the amount of six percent (6%) of the sale price.

**END OF DOCUMENT**